**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X

THE SUN PRODUCTS
CORPORATION,

                    **Plaintiff,**

          - against -

JERRY BRUCH, HIGH POINT
GROUND and AMERICAN
DISTRIBUTION COMPANY,

                    **Defendants.**

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/28/11_

**OPINION AND ORDER**

**10 Civ. 4816 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

The Sun Products Corporation ("Sun") brings this diversity action against Jerry Bruch, the High Point Ground ("High Point"), and American Distribution Company ("ADC") alleging (1) breach of contract, (2) unjust enrichment, (3) vicarious and contributory trademark infringement, (4) direct trademark infringement, (5) common-law trademark infringement, (6) unfair competition, and (7) fraud, in connection with defendants' conduct in allegedly (1) manufacturing and selling products with Snuggle brand trademarks and designs in violation of Sun's registered trademarks, and (2) underreporting royalties on

1

validly licensed trademarked products.  Sun now moves for partial summary

judgment on its claim for fraudulent misrepresentation against Bruch.  For the

following reasons, Sun's motion is granted.

## II.     BACKGROUND[1]

### A.     The Parties

Sun is a Delaware corporation with its principal place of business in

Connecticut.[2]  Sun is a leading North American provider of laundry detergent,

fabric softeners, dish-care and other household products with annual sales of over

$2 billion.[3]

Bruch is a resident of Pennsylvania.[4]  Bruch is the president and sole

shareholder of ADC, a corporate entity organized under Pennsylvania law.[5]  High

---

[1]     Both parties submitted written statements of facts pursuant to Local Civil Rule 56.1, with Bruch admitting to the majority of Sun's alleged facts.  *See* Plaintiff Sun's Rule 56.1 Statement ("Pl. 56.1"); Defendant Jerry Bruch's Counter Statement of Material Facts ("Def. 56.1").  Accordingly, the facts in this case are taken from Sun's Rule 56.1 Statement as well as the pleadings, declarations and exhibits, and the Deposition of Jerry Bruch, *see* 12/15/10 Deposition of Jerry Bruch ("Bruch Tr."), Ex. A to 9/6/11 Declaration of Byron L. Pickard, plaintiff's counsel, ("Pickard Decl.").  All inferences are drawn in Bruch's favor for the purpose of this motion.

[2]     *See* Pl. 56.1 ¶ 1.

[3]     *See id.* ¶ 2.

[4]     *See id.* ¶ 6.

[5]     *See id.* ¶ 7; Def. 56.1 ¶ 46.

Point is an alternative trade name for ADC.[6]

**B.    The Snuggle Brand Trademark**

The Snuggle brand trademark has been in use since July 1983.[7] Appearing on air-fresheners and other household products, the Snuggle brand trademark and design includes the image of a plush or toy bear displayed prominently on trade dress alongside the brand name "Snuggle" in distinctive shape and font.[8]  The Snuggle Bear design serves as a unique symbol as well as an indicator to customers of the product's source and quality.[9]  Between 1996 and 2009, Sun and Unilever, its predecessor in interest, have spent over $190 million on television, print and other media advertising to promote the Snuggle brand.[10] The Snuggle brand trademarks have generated a high degree of success for Sun and Unilever, and are currently registered to Sun under United States Trademark Registration Numbers 1246754, 2854675, 1604278, 2990008, and 2701266.[11]

**C.    The Licensing Agreement**

---

[6]    *See* Pl. 56.1 ¶ 8; Def. 56.1 ¶ 8.

[7]    *See* Complaint ("Compl.") ¶ 19.

[8]    *See id.*

[9]    *See id.* ¶¶ 17, 19.

[10]    *See id.* ¶ 21.

[11]    *See id.* ¶¶ 22, 39.

In August 2004, Unilever, then owner of the Snuggle brand trademarks, entered into a licensing agreement with High Point regarding the use of the Snuggle brand (the "Licensing Agreement").[12]  Bruch signed the Licensing Agreement on behalf of High Point.[13]  Under the Licensing Agreement, Unilever granted High Point a license to use certain Snuggle brand trademarks and logos in High Point's manufacture and sale of automobile air-fresheners and hanging air-fresheners.[14]  The Licensing Agreement further provided that High Point would pay Unilever royalties of seven percent of net sales of licensed products and would submit quarterly royalty reports and payments to Equity Management, Inc., Unilever's licensing representative.[15]  Finally, the Licensing Agreement provided that New York law would control any dispute arising thereunder.[16]  The Licensing Agreement expired on December 31, 2007, and Unilever notified High Point of its intention to terminate the Licensing Agreement at that time.[17]

---

[12]    *See* Pl. 56.1 ¶ 9; *see also* 8/12/04 Trademark License Agreement (the "Licensing Contract"), Ex. D to Pickard Decl.

[13]    *See* Pl. 56.1 ¶ 9.

[14]    *See id.* ¶ 11.

[15]    *See id.* ¶¶ 12-13.

[16]    *See* Def. 56.1 ¶ 54.

[17]    *See* Compl. ¶ 29.

### D.    The Purchase Agreement

In September 2008, Sun purchased from Unilever all assets and rights associated with Unilever's Snuggle brand (the "Purchase Agreement").[18]  Under the Purchase Agreement, Sun acquired the trademarks, trade dress, trade secrets, goodwill, contracts and causes of action associated with the Snuggle brand.[19] Since that time, Sun has maintained the exclusive rights to manufacture, license and sell products bearing the Snuggle trademarks and designs, and Sun has devoted a great deal of resources on advertising and promoting the Snuggle brand.[20]

### D.    The Trademark Infringement

By 2010, although the Licensing Agreement had expired, Sun discovered a large quantity of air-freshener products on the market manufactured by High Point and bearing the Snuggle brand trademark and design.[21]  This discovery led to an investigation by Sun and, ultimately, to the present lawsuit.[22]

---

[18]    *See* Pl. 56.1 ¶ 4; *see also* 7/26/08 The Asset Purchase Agreement (the "Purchase Contract"), Ex. A to 2/8/11 Declaration of Denise Cotton, Sun's Contracts Database Administrator, authenticating Documents.

[19]    *See* Pl. 56.1 ¶ 5.

[20]    *See id.*; Compl. ¶ 21.

[21]    *See* Compl. ¶¶ 31-32; *see also* Infringing Product Images, Exs. A and B to Compl.

[22]    *See* Compl. ¶¶ 31-47.

Following the initiation of this action, this Court entered a default judgement against ADC after it failed to appear or otherwise defend itself in the lawsuit.[23] Thus, Sun's remaining claims are asserted solely against Bruch.

### E.     The False Royalty Reports

Sun's investigation further revealed that over the course of the Licensing Agreement, High Point had submitted thirteen royalty reports to Unilever that were inaccurate and had failed to report the true amount of royalties owed to Unilever.[24]   Bruch prepared all of these royalty reports, and signed at least twelve of them.[25]   By signing each of the royalty reports, Bruch certified them to be "true and accurate."[26]   However, the royalty reports understated both the sales of licensed products as well as the royalties due to Unilever under the Licensing Agreement.[27]

At his deposition, Bruch testified explicitly that he had underreported

---

[23]     *See* 5/2/11 Order for Default Judgment.

[24]     *See* Pl. 56.1 ¶¶ 14, 19.

[25]     *See id.* ¶¶ 15-16.

[26]     *Id.* ¶¶ 17-18.   *Accord* Bruch Tr. at 110:11-15 ("Q.  Okay.  So when you signed it, you were certifying this royalty report is certified to be true and correct by the above named licensee; is that correct?  A.  Yes.").

[27]     *See* Pl. 56.1 ¶ 20.

the royalties.[28]  Bruch admitted that he "did not fill out the reports as" best as he

could, and that he "did not have the total amount of the royalties on the reports."[29]

Bruch explained that he had underreported royalties because he was "very upset

with Unilever" and he thought that he could repay Unilever at a later time.[30]

Specifically, Bruch was frustrated because he had worked so hard to create the

product line, and he felt that Unilever had acted unfairly toward him.[31]  Bruch

estimated that the reports he worked on had underreported the royalties by about

$270,000.[32]  Later in his deposition, Bruch again affirmed that he "knew [he was]

under paying but [he] thought the day would come when [he] could make it

right."[33]

   Bruch managed to avoid paying royalties by reporting "less goods

---

[28] *See* Bruch Tr. at 74:15-77:5.

[29] *Id.* at 74:15-22.

[30] *Id.* at 75:8-12.

[31] *See id.* at 127:9-22.

[32] *See id.* at 76:5-8.

[33] *Id.* at 180:3-12.  *Accord id.* at 190:2-8 ("Q.  And that, that's how you rationalized it to yourself as being something you could make up later or so; right?  A.  I was rationalizing it like that in addition to me potentially going after them and it'll all work out in the end.  That's exactly how I was doing it.").

[sold] than actually were."[34]   In underreporting the amount of royalties owed, Bruch hoped to bring in "more profits" in order to resolve any problems he had with Unilever later on.[35]   Bruch also stated that he never told Unilever about the inaccurate royalty reports, despite the fact that he complained to them on other occasions about the way he was treated.[36]

On the basis of Bruch's deposition, Sun now moves for summary judgment on its claim of fraudulent misrepresentation against Bruch for his role in intentionally underreporting royalties.   Based on Sun's calculation of the amount of licensed products that High Group actually sold through another company, Core Brands, in 2006 and 2007, Unilever was owed $434,105 in royalties during that time.[37]   The parties dispute whether New York or New Jersey law applies to this action, and Bruch denies that he committed fraud and argues, in the alternative, that he cannot be held personally liable for it.[38]

## III.   LEGAL STANDARD

---

[34]      *Id.* at 75:16-21.

[35]      *Id.* at 127:9-128:4.

[36]      *See id.* at 120:7-121:1.

[37]      *See* Pl. 56.1 ¶¶ 39-45.   Bruch does not dispute this figure.   *See* Def. 56.1 ¶¶ 44-45.

[38]      *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem.") at 2.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[39]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit  under the governing law.'"[40]

"The moving party bears the burden of establishing the absence of any genuine issue of material fact."[41]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[42]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[43] and "'may not rely on conclusory allegations or unsubstantiated

---

[39]   Fed. R. Civ. P. 56(a).

[40]   *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

[41]   *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[42]   *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[43]   *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

speculation.'"[44]

    In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[45]  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[46] "'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[47]

## IV.  APPLICABLE LAW

### A.  Choice of Law

    In diversity actions, federal courts follow the choice-of-law rules of the forum state to determine the controlling substantive law.[48]  Under New York

---

    [44]    *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

    [45]    *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

    [46]    *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

    [47]    *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

    [48]    *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006).

choice-of-law rules, courts first determine whether there is a substantive conflict between the laws of the relevant choices.[49]  "In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."[50]

**B.    Fraud**

**1.    New York Law**

"The elements of fraud under New York law are: '[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury.'"[51]  "[U]nder New York law, parallel fraud and

---

[49]    *See GlobalNet Financial.com*, 449 F.3d at 382 ("The New York Court of Appeals has held that 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'") (quoting *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)).

[50]    *International Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).  *Accord Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs.*, No. 10 Civ. 2737, 2011 WL 2465963, at *10 (S.D.N.Y. June 22, 2011).

[51]    *Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).

11

contract claims may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages."[52]   Moreover, under New York law "officers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it."[53]

### 2.    New Jersey Law

Under New Jersey law, "[t]he 'five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'"[54]   "Although the New Jersey Supreme Court has never expressly decided under what circumstances a fraud claim for purely economic loss . . . can be sustained, courts in New Jersey have interpreted the economic loss

---

[52]    *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).

[53]    *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994).  *Accord Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir. 1995).

[54]    *Alves v. Verizon*, Civ. No. 08-3196, 2010 WL 2989988, at *12 (D.N.J. July 27, 2010) (quoting *Gennari v. Weichert Realtors*, 148 N.J. 582, 610 (1997)).

doctrine to mean that a party to a contract may only bring a claim for fraud that is extraneous to the contract."[55]  "New Jersey law also makes clear that an agent is jointly and severally liable for her own fraudulent acts or false representations, even when they are in furtherance of the corporate business."[56]

## V.   DISCUSSION

### A.   New York Law Applies to This Dispute

As an initial matter, the parties dispute whether New York or New Jersey law governs this dispute.  Sun argues that New Jersey law applies to the count of fraud because "it [is] the place of harm for Sun's fraud count" based on the fact that Unilever ran its business out of New Jersey.[57]  Bruch counters that

---

[55]    *Transmodal Corp. v. EMH Assocs., Inc.*, Civ. No. 09-3057, 2010 WL 3937042, at *4 (D.N.J. Oct. 1, 2010).  *Accord Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002) ("The economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract.'") (quoting *Duquesne Light Co. v. Westinghouse Elec. Co.*, 66 F.3d 604, 618 (3d Cir. 1995)).

[56]    *Maertin v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434, 459 (D.N.J. 2002).

[57]    Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at 5 n.3.  Even Sun must admit, however, that this fact alone is not sufficient to justify the application of New Jersey law, *see Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (1994) ("In the context of tort law, New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation.  The greater interest is determined by an evaluation of the facts or contacts which . . . relate to the purpose of the particular law in conflict.") (quotation marks omitted).

because this action is primarily based on breach of contract, the Licensing

Agreement explicitly provides that New York law applies.[58]  Because I conclude

that there is no conflict between the two laws, New York law will govern this

dispute.

Both New York and New Jersey courts agree that, at its core, a claim

of fraud includes (a) representation of fact; (b) known falsity; (c) scienter; (d)

deception; and (e) injury.[59]  Moreover, both New York and New Jersey courts are

in agreement that a claim for fraud will be barred when it duplicates a claim for

breach of contract arising out of the same facts.[60]  Accordingly, I will apply New

York law to Sun's claim of fraud.[61]

### B.   Bruch Has Failed to Rebut Sun's Direct Evidence that He Engaged in Fraud

Bruch offers five arguments as to why he cannot be held liable for

---

[58]     *See* Def. Mem. at 5.

[59]     *See Premium Mortgage*, 583 F.3d at 108; *Alves*, 2010 WL 2989988, at *12; *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995).

[60]     *See Transmodal Corp.*, 2010 WL 3937042, at *4 n.1 (noting that "New York law is in accord with New Jersey" regarding the doctrine that bars "fraud claims where the alleged misrepresentation is not extraneous to a contract").

[61]     *See International Bus. Mach.*, 363 F.3d at 143.  In any case, despite this stated dispute between the parties, both Sun and Bruch cite predominantly to New York caselaw in their respective memoranda of law.

fraud.  Bruch claims that (1) there is a question of material fact regarding whether Bruch possessed a sufficient intent to commit fraud; (2) Sun's fraud claims are barred because they are duplicative of Sun's breach of contract claims; (3) Sun cannot hold Bruch personally liable because he was acting as a corporate officer of ADC; (4) Sun did not acquire the right to sue in tort on Unilever's behalf; and (5) Unilever also acted in bad faith toward Bruch.  Because I conclude that none of these arguments raise a material issue of fact regarding the fraud claim, Sun's motion is granted.

### 1.    Sun Has Proved All the Elements of Fraud

Based on Bruch's deposition testimony, there is no dispute that Bruch made material misrepresentations and that Sun relied on those representations to its detriment.[62]  Bruch argues, though, that because he intended to adequately compensate Unilever over the course of the Licensing Agreement, there is a material issue of fact regarding whether he possessed the "requisite intention to commit fraud."[63]  This argument, however, misses the point.  All that is needed to show fraud is the defendant's "intent to defraud,"[64] and there is no question that

---

[62]    *See* Bruch Tr. at 74:15-22; Pl. 56.1 ¶ 38.

[63]    Def. Mem. at 13.

[64]    *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).

Bruch intended to submit inaccurate royalty reports to Sun, and that Sun would rely on those reports.  Thus, the fact that Bruch claims that he intended to rectify the results of his fraud at some unspecified future time is irrelevant to Sun's allegations of fraud.

### 2. Bruch Can Be Sued in Tort Because He Was Not a Party to the Contract

While Bruch is correct that a party is generally barred from suing in fraud when the identical allegations support a breach of contract, that defense is inapplicable where, as here, Bruch was not a party to the contract.  The rule barring duplicative claims of fraud and breach of contract is only applicable where the two claims are asserted against a common defendant.[65]  Bruch has not cited any authority suggesting that a breach of contract claim against one party can bar a claim of fraud against another.[66]  It is undisputed that the Licensing Agreement was

---

[65]     *See, e.g., Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1160-61 (S.D.N.Y. 1996) ("Most courts that have subsequently considered the issue have held that a contract claim cannot be converted into a fraud claim by the addition of an allegation that *the promisor* intended not to perform when he made the promise.") (emphasis added) (collecting cases); *see also Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 83 N.Y.2d 603, 614 (1994) ("[A] contract action cannot be converted to one for fraud merely by alleging that *the contracting party* did not intend to meet its contractual obligations.") (emphasis added).

[66]     To the extent that the Second Circuit in *Bridgestone/Firestone*, 98 F.3d at 19-20, barred a fraud claim against the individual defendant, the court in that case had already pierced the corporate veil, thus concluding that plaintiff could proceed on its breach of contract claim against the individual defendant.  Here, by

entered into between Unilever and High Group as corporate entities, and not by Bruch in his individual capacity.[67]  In fact, Sun admits — and Bruch vigorously asserts — that Bruch was *not* a party to the Licensing Agreement.[68]  Thus, the breach of contract claim does not preclude Sun from pursuing fraud against Bruch.

      Although Bruch argues that Sun alleges a breach of contract claim against Bruch as an alter-ego of ADC, the Federal Rules of Civil Procedure explicitly allow a plaintiff to plead alternative — and even inconsistent — theories and claims.[69]  It is, therefore, not inappropriate for Sun to pursue its claim of fraud against Bruch — despite its breach of contract claim against Bruch — having now discovered that it cannot pierce the corporate veil.  Thus, because Sun now believes, and Bruch agrees, that Sun cannot pursue Bruch on its breach of contract claim, Sun is entitled to pursue this claim against Bruch in addition to its breach of contract claim against ADC.

      **3.    Sun's Fraud Claim Does Not Depend on Piercing ADC's**

---

contrast, Sun admits — and Bruch agrees — that ADC's corporate veil cannot be pierced and thus Sun has no breach of contract claim against Bruch individually. *See* Plaintiff's Reply in Further Support of Its Motion for Summary Judgment ("Pl. Rep.") at 6.

[67]     *See* Licensing Contract at 1.

[68]     *See* Pl. Rep. at 5-6; Def. 56.1 ¶ 5.

[69]     *See* Fed. R. Civ. P. 8(d)(2)-(3).

**Corporate Veil**

Bruch further argues that he cannot be held liable for fraud because there is no evidence that would warrant piercing ADC's corporate veil and holding Bruch personally liable for any fraud that may have been committed.[70]  Bruch is certainly correct that "[i]t is well settled that New York courts are reluctant to disregard the corporate entity" and that "New York allows individuals to incorporate for the very purpose of avoiding personal liability."[71]  However, it is not necessary here to pierce the corporate veil because the fraud claim is being asserted against Bruch individually.  In fact, it is well settled that

> [w]here a plaintiff asserts tort claims such as for fraud or fraudulent misrepresentation, there is *no need to pierce the corporate veil* in order to hold corporate officers or employees individually liable for their own acts of fraud. . . . Instead, [a] corporate officer is individually liable for fraudulent acts or false representations of his own, or in which he participates, even though his actions in such respect may be in furtherance of the corporate business.[72]

Thus, Bruch cannot escape liability by claiming that he was acting on behalf of

---

[70]    *See* Def. Mem. at 9.

[71]    *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989) (quotation marks and citations omitted).

[72]    *White v. National Home Prot., Inc.*, No. 09 Civ. 4070, 2010 WL 1706195, at *5 (S.D.N.Y. Apr. 21, 2010) (quotation marks and citations omitted) (emphasis added).

ADC and thereby shielded from personal liability.  Bruch's deposition testimony

establishes with ample clarity that Bruch took personal actions to perpetrate the

fraud and was aware of it.[73]  Sun has therefore met its burden of showing that

Bruch can be held personally liable.

### 4.   Sun Has Acquired the Rights to Sue Bruch in Tort

Bruch argues that Sun lacks standing to sue Bruch for fraud because

the fraud, if any, was committed against Unilever and not Sun.[74]  However,

according to the Purchase Agreement, Sun acquired all rights and assets previously

held by Unilever.[75]  Bruch has not shown why the broad language of the Purchase

Contract should not be read to transfer to Sun the type of claims and recovery

asserted here against Bruch.[76]

### 5.   Any Offsets Based on Unilever's Conduct Are Irrelevant

---

[73]     *See, e.g.*, Bruch Tr. at 180:3-12.

[74]     *See* Def. Mem. at 4.

[75]     *See* Purchase Contract § 1.02(a)(ix) (including as transferred assets
"all rights of recovery, rights of set-off, rights of compensation, Claims and causes
of action of either Seller or any of the Seller affiliates to the extent relating to any
other Transferred Asset of any Assumed Liabiltiy"); *see also* 9/6/11 Declaration of
Brian J. Del Buono, vice president of Sun, ¶ 6.

[76]     *Cf. Momentive Performance Materials USA, Inc. v. AstroCosmos*, 659
F. Supp. 2d 332, 338 (N.D.N.Y. 2009) ("The Court finds that the use of the phrase
'any nature' to define the claims assigned is sufficient to demonstrate an intention
to transfer all claims, including those sounding in tort.").

Finally, Bruch claims that even if he engaged in fraud, any damages would be subject to a "set off to account for the Licensor's bad faith conduct."[77] Bruch thus concedes that this issue is relevant to damages only and not to the merits of the fraud claim. Accordingly, Bruch has not raised any issue of material fact that requires Sun's allegation of fraud to be tested at trial.

## VI.    CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is granted. The Clerk of the Court is directed to close this motion [Docket No. 39]. A conference is scheduled for November 7 at 5:00 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 28, 2011

---

[77]    Def. Mem. at 13.

20

**- Appearances -**

**For Plaintiff:**

Mark Kenneth Silver, Esq.
Michael J. Sullivan, Esq.
Coughlin Duffy LLP
350 Mount Kemble Avenue
P.O. Box 1917
Middletown, NJ 07962-1917
(973) 267-0058

David K. S. Cornwell, Esq.
Byron Leroy Pickard, Esq.
Sterne, Kessler, Goldstein & Fox PLLC
1100 New York Ave., N.W.
Washington, DC 20005
(202) 371-2600

**For Defendant:**

Rick Aaron Steinberg, Esq.
Ciardi Ciardi & Astin
100 Church Street, 8th Floor
New York, NY 10007
(646) 485-0605

Albert A. Ciardi, III, Esq.
Kevin Gordon McDonald, Esq.
Ciardi Ciardi & Astin
One Commerce Square
2005 Market Street, Suite 1930
Philadelphia, PA 19103
(215) 557-3550